# ROTH *v.* DISTRICT OF COLUMBIA.

---

DISTRICT OF COLUMBIA; METROPOLITAN POLICE; NUISANCE.

1. The Metropolitan police of the District of Columbia is a branch of the municipal organization of the District, subject to the control of the municipality and for the acts of which the municipality is liable; *construing* section 6 of the act of Congress of June 11, 1878 (20 Stat. 102), establishing a permanent form of government for the District.

2. While the mere maintenance or location of a police ambulance stable by a municipality may not of itself be a nuisance, since it is a necessary and proper appliance of governmental

authority, its maintenance in a negligent, improper and unlawful manner is not warranted by any requirement of governmental duty, and for such maintenance the municipality is liable in damages.

3. Where by law the District of Columbia is the owner of a police ambulance stable, the municipality is, as owner, charged with the duty of keeping it in proper condition, and is liable in damages if it permits it to become a nuisance, whether it derives any profit or advantage from the maintenance of the stable or not.

No. 955. Submitted March 9, 1900. Decided April 3, 1900.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia upon a verdict for the defendant directed by the court, in an action against the District of Columbia for damages for an alleged nuisance. *Reversed.*

The COURT in its opinion stated the case as follows:

The appellant, Catherine Roth, being the owner of a lot of ground in the city of Washington, upon which there is a frame dwelling house, known as No. 1228 Fifth street northwest, and in which she has resided for a number of years, instituted suit in the Supreme Court of the District of Columbia against the District of Columbia as defendant, which was the owner of the adjoining lot of ground and premises, and which had erected a building thereon used as a stable for the ambulance service of the police department of the District, to recover damages for an alleged nuisance maintained on its lot and premises by the defendant, consisting of loud noises, offensive and unwholesome odors, swarms of flies and vermin, and the like, existing upon and emanating from said premises, to the great injury of the plaintiff. The declaration contained three counts, each of which sufficiently set forth a good cause of action, if the suit was maintainable against the defendant; and to each and all the counts the defendant pleaded the general issue.

At the trial the plaintiff adduced testimony which tended to fully sustain her contention of the existence of a nuisance

on the premises, as alleged, and entitled her to go to the jury on the issue of fact, if there was no legal objection to the submission of the case to the jury. The testimony on behalf of the defendant tended to a greater or less extent to controvert that of the plaintiff in regard to the fact of the alleged nuisance. But it went farther and adduced facts by which it was sought to be shown that the District of Columbia was under no legal liability for the alleged nuisance, even if it existed as was claimed. The testimony upon which this contention was based is in the printed record before us stated in the following language:

"That the police ambulance service conducted in said stable is connected with the police department of the District of Columbia; that the appropriation for conduct of the ambulance stables was made in the District of Columbia appropriation act under the head of 'Metropolitan Police'; that the property in said stable belongs to the police department, and that the wagons, horses, etc., are provided for out of the appropriation made by Congress for the Metropolitan police; that said stable and station are and always have been under the control and direction of the said police department; that the drivers of said ambulance and patrol wagons are paid out of the appropriation for drivers of the Metropolitan police department, and that the said ambulance service disposes of cases under the direction of the police sanitary officer, emergency cases, and generally 'dependent cases' coming under the police; that the said 'patrol service' is used for the conveyance of prisoners to the station houses, and that the said ambulances are in the service of the police generally; that the 'ambulance service' is under the sanitary officer detailed by law to care for the sick and the insane; that he has no connection with the health officer; that he is an officer of the Metropolitan police, and that his salary is paid out of the Metropolitan police appropriation."

Upon this testimony a motion was made on behalf of the

defendant for a peremptory direction to the jury to render a verdict in its favor, on the ground that the ambulance stable in question and its appurtenances were under the superintendence of the Metropolitan police force of the District of Columbia, and in its management the police officers perform a public, and not a municipal duty; and that the Metropolitan police force is a distinct and separate organization independent of the District of Columbia, and its acts are not the acts of officers or agents of the District. The court allowed the motion, and instructed the jury to render a verdict for the defendant, which was accordingly done; and thereupon judgment was entered for the defendant. From this judgment appeal has been taken by the plaintiff.

*Mr. Charles A. Douglass, Mr. A. E. L. Leckie* and *Mr. Levi H. David* for the appellant:

1. The Metropolitan police is a part of the government of the District of Columbia, and the employees in that department are the agents and representatives of the municipality. See *Barnes* v. *Dist. of Col.*, 91 U. S. 540; *Dist. of Col.* v. *Gas Co.*, 3 Mack. 347; *Dist. of Col.* v. *Woodbury*, 136 U. S. 450; *Eckloff* v. *Dist. of Col.*, 135 U. S. 240; *Dist. of Col.* v. *Hutton*, 143 U. S. 18.

2. For the nuisance created by the acts done, or omitted to be done, by the employees charged with the duty of properly and carefully conducting the ambulance stable, the District of Columbia is liable. A municipality can not, with impunity, create or maintain a nuisance, either of a public or private character. *Brower* v. *Mayor*, 3 Barb. 254; *Nichols* v. *Boston*, 98 Mass. 43; *Eastman* v. *Meredith*, 36 N. H. 296; *Lead Co.* v. *Rochester*, 3 N. Y. 468; *Galveston* v. *Posnainski*, 62 Tex. 119; *Rhodes* v. *Cleveland*, 10 Ohio, 161; *Mayor* v. *Willison*, 50 Md. 138; *Conrad* v. *Ithaca*, 16 N. Y. 172; *Carrington* v. *St. Louis*, 89 Mo. 215; *Bailey* v. *New York*, 2 Denio, 439; Wood on Nuisance, Sec. 744; *Railroad Co.* v. *Norwalk*, 37 Conn. 109; *Mooty* v. *Danbury*, 45 Conn. 550;

*Barnes* v. *Dist. of Col.*, 91 U. S. 540; *Woodbury* v. *Dist. of Col.*, 136 U. S. 450; *Haskell* v. *New Bedford*, 108 Mass. 208; *Wilson* v. *New Bedford*, 108 Mass. 261; Wood on Nuisances, Sec. 744; 2 Dillon on Mun. Corp. (3d Ed.), Sec. 985; *Weet* v. *Brockport*, 16 N. Y. 161; Jones on Neg. Mun. Corp., Sec. 25.

3. The fact that the improvements or works were legally authorized, and for a public purpose, and that the municipality derives no pecuniary benefit therefrom, is immaterial. *Miles* v. *Worcester* (Mass.), 13 L. R. A. 841; *Bailey* v. *New York, supra*; *Brower* v. *New York, supra*; *Mayor* v. *Willison*, 50 Md. 160. To injuriously affect one's property is a "taking" in the sense of the constitutional inhibition. *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166.

*Mr. Andrew B. Duvall*, Attorney for the District of Columbia, and *Mr. Clarence A. Brandenburg*, Assistant Attorney, for the appellee:

1. The Metropolitan police force of the District is a separate and distinct organization from the municipality, not controlled by the municipality, and its acts are not the acts of officers or agents of the District of Columbia. The stable is not kept and operated by the municipality, and the District is not responsible for its maintenance. The ambulance drivers, who cared for the horses and cleaned the stable, were engaged in performing not municipal, but public duties. For their negligent discharge of such duties no liability attached to the municipality. Jones on Neg. Mun. Corp., Sec. 27.

2. In the absence of statutory provision, no action can be maintained against a municipality for neglect of a public duty imposed upon it as the agent of the public, for the benefit of the public, and for the performance of which the corporation receives no profit or special advantage. Dill. Mun. Corp. (4th Ed), Secs. 965*a* and 975; Tiedeman Mun. Corp., Secs. 332 and 333; 19 Am. & Eng. Encyc. L. 557, and cases cited. The officers who exercise such power are

the agents and servants of the public at large, and not of the municipality, though appointed or elected by it.   Neither can a municipal corporation be held liable for the acts of its officers and agents which are *ultra vires* and beyond the power of the corporation to perform, nor for the illegal or unauthorized acts of its officers, though done *colore officii.* 19 Am. & Eng. L. 559; *Maximillian* v. *Mayor,* 62 N. Y. 160; *Ogg* v. *Lansing,* 35 Iowa, 495; *Hayes* v. *Oshkosh,* 33 Wis. 304; *Kiley* v. *Kansas,* 87 Mo. 103; *Caldwell* v. *Boone,* 51 Iowa, 687; *Elliot* v. *Philadelphia,* 75 Penna. St. 347; *McKay* v. *Buffalo,* 74 N. Y. 619.   Among the numerous adjudications establishing the non-liability of municipal corporations in respect of the negligent performance of general or public duties are the following: *Grumbine* v. *Mayer,* 2 MacA. 578; *Stinnett* v. *Sherman,* 43 S. W. Rep. 847; *Wild* v. *Mayor,* 47 N. J. L. 406; *Frederick* v. *Columbus,* 51 N. E. Rep. 35; *Miller* v. *Minneapolis,* 77 N. W. Rep. 788; *Liberty* v. *Hurd,* 74 Me. 101; *Cushing* v. *Bedford,* 125 Mass. 526; *Waller* v. *Dubuque,* 69 Iowa, 541; *Ogg* v. *Lansing,* 35 Iowa, 495; *Kempster* v. *Milwaukee,* 79 N. W. Rep. 411; *Davidson* v. *New York,* 54 N. Y. S. 51; *Curran* v. *Boston,* 151 Mass. 505; *Hart* v. *Bridgeport,* 13 Blatchf. 289; *Grube* v. *St. Paul,* 34 Minn. 403; *Robinson* v. *Evansville,* 87 Ind. 334; *Wilcox* v. *Chicago,* 107 Ill. 338.   To the same effect, with reference to negligence of the police, are *Corsicana* v. *White,* 57 Tex. 382; *Pollock* v. *Louisville,* 13 Bush, 222; *Caldwell* v. *Boone,* 51 Iowa, 687; *McElroy* v. *Albany,* 65 Ga. 387; *Cook* v. *Macon,* 54 Ga. 68; *Campbell* v. *Montgomery,* 53 Ala. 530; *Snider* v. *St. Paul,* 18 L. R. A. 152.

Mr. Justice MORRIS delivered the opinion of the Court:

Upon the exception taken by the plaintiff to the ruling of the court below, and the assignments of error founded thereon, two principal questions are presented for determination: (1) Whether the Metropolitan police organization of the District of Columbia is a branch of the municipal organization known as the District of Columbia, or a distinct

and independent organization which the municipality does not control and for the acts of which the municipality is not liable; (2) Whether the conduct and management of the ambulance stables, out of which grew the alleged nuisance complained of by the appellant, were public duties for which it is claimed the District of Columbia as a municipality would not be liable, or were municipal duties for which it is conceded the District would be liable. Upon neither of these questions do we find ourselves able to concur in the conclusion reached by the learned justice who presided at the trial of the cause in the court below. We are of opinion that the police force of the District of Columbia is an integral part of the municipal organization of the District; and we are likewise of opinion that, even if this were not so, the District of Columbia, as a municipality, is liable for the nuisance, or alleged nuisance, complained of in these proceedings, if such nuisance is shown to exist.

1. Whatever may have been the legal relations between the District of Columbia as a municipality and the organization of the Metropolitan police force of the District prior to the act of Congress of June 11, 1878 (20 Stat. 102), which established a permanent form of government for the District of Columbia, we are satisfied that, since the passage of that act, the police organization has been merged in that of the municipality. By the sixth section of the act of June 11, 1878, two previously existing independent or semi-independent organizations of governmental character, and apparently the only organizations of the kind that then remained in existence, the board of Metropolitan police and the board of school trustees, both of which had maintained a separate existence, not only from the old corporations of Washington and Georgetown, and the levy court of the county of Washington, but likewise from the subsequent municipality which succeeded these under the act of February 21, 1871, the District of Columbia, were abolished, and their powers and duties were transferred to the Commissioners of the District

of Columbia, the executive officers then established as the organs of the municipality. It is contended, on behalf of the appellee, that this transfer of power and duty was not to the District of Columbia as a municipality, but to the Commissioners of the District as individuals. In other words, it is claimed that the act did not have the effect of making the police force a part of the municipal or governmental organization of the District of Columbia, but simply that of substituting the persons who happened to be Commissioners for the time being in the place and stead of the former police board, in the interest of economy. To the correctness of this contention we can not assent. We see no good reason for any such construction of the act.

By the express provisions of the act it was determined by Congress that the District of Columbia should "remain and continue a municipal corporation," as constituted by the act of February 21, 1871 (16 Stat. 419); and that the Commissioners provided for in the act and in whom the charge and control of the affairs of the municipality should be vested, were to "be deemed and taken as officers of such corporation." Yet not a single power of any kind is given by express terms in that statute to the corporation thus continued in existence. By the act of February 21, 1871, by which the District of Columbia had been created a corporation for municipal purposes, it had received the usual corporate powers to "contract and be contracted with, sue and be sued, plead and be impleaded, and have a seal," and a further very general grant to "exercise all other powers of a municipal corporation, not inconsistent with the Constitution and laws of the United States and the provisions of this act." And it received what was designated and understood to be a territorial organization of government to carry these powers into effect. With the repeal and overthrow of the territorial organization, first by the temporary expedient of the act of June 20, 1874 (18 Stat. 116), and afterwards by the permanent arrangement under the act of June 11,

1878, all this grant of power, so far as it was legislative, was withdrawn, and only the executive power remained which had previously been vested in the governor and board of public works, and which was now transferred to the Commissioners. The corporation remained, but it was powerless to act, except as Congress legislated for it and authorized the Commissioners to act for it. It was to the Commissioners then and ever thereafter, and never at any time to the District of Columbia as a municipality by express words, did the Congress address itself when it desired any municipal function to be performed. And yet undoubtedly all the powers then and thereafter by various enactments conferred upon the Commissioners were not in law conferred upon them individually and as distinguished from the municipality whose officers they were, but upon them as the agents of the municipality, and upon the municipality through them. We have repeatedly had occasion to consider the police regulations made by the Commissioners under authority of Congress to make such regulations; and it is always the District of Columbia as a municipality that is made a party to enforce such regulations; and it is the District of Columbia which is sought to be held liable, and not the Commissioners individually, when any rights of individuals have been supposed to have been infringed by them.

When the Congress transfers the control and management of the police force to the Commissioners, why should not the grant of authority here also be construed as being made to them as the officers and agents of the municipality of the District of Columbia for the use and benefit of such municipality? Congress itself has expressly provided that the Commissioners are to be deemed and taken as officers of such corporation; and this is equivalent to a command that, in the construction of its own enactments the Commissioners are to be construed as receiving for the corporation all powers conferred upon them, and not otherwise.

And in view of this express declaration of legislative pur-
pose and intention, it would seem that it should be made
to appear very clearly that such rule of construction should
not apply in any particular instance where its application
is sought to be excluded. The transfer of the charge of the
police force to the Commissioners is made in the very same
statute in which is contained the declaration of the inten-
tion of Congress as to the character in which the Commis-
sioners are to take any grant of authority; and it would do
violence to the statute to hold that the declared purpose of
Congress should not be given its due effect here as else-
where. If the control and management of the police force
were something of a peculiar character which never before
had been intrusted to a municipality, or if there were any
apparent principle of public policy to be subserved by the
recognition of a distinction of character which we fail to
find in existence, it may be that a different construction of
the statute would be possible. But we know of no such
principle of public policy; and we know that the control
and management of the police force are universally regarded
throughout all the States of our Union as being within the
usual scope of municipal action, and only in exceptional
cases and for exceptional circumstances are taken away by
the State from the municipality, as it may be in any and
all cases whenever deemed expedient for the public
welfare.

It is very evident that it was the purpose of Congress in
the act of June 11, 1878, to consolidate all the branches of
municipal and local government in the District of Colum-
bia in the hands of the Commissioners as administrators of
the municipality, and to put an end to all independent or
semi-independent organizations exercising governmental or
municipal functions within the territory of this District.
And when such was the evident purpose, we do not see why
a strained construction should be given to its enactments that
would tend to defeat or thwart that purpose, and re-establish

in the District an aggregation of hydra-headed and practically irresponsible organizations.

While perhaps none of the cases cited on behalf of the appellant on this branch of the case is directly upon the point here considered, it is clear to us that the rulings in all of them tend to sustain the contention of the appellant in this regard. *Barnes* v. *Dist. of Col.,* 91 U. S. 540; *Eckloff* v. *Dist. of Col.,* 135 U. S. 240; *Dist of Col.* v. *Woodbury,* 136 U. S. 450; *Dist. of Col.* v. *Hutton,* 143 U. S. 18; *Dist. of Col.* v. *Bailey,* 171 U. S. 161. In one of these cases, that of *Eckloff* v. *Dist. of Col.,* the Supreme Court of the United States said:

"When to a board having general administrative supervision of the affairs of a community and with plenary power in the matter of the appointment and removal of subordinates, is added the control of another department, and no express words of limitation are found in the act making the transfer, it is to be presumed that such board has the same plenary power in respect of this new department, and is not hampered by limitations attached to the board which theretofore had control of it. The presumption against implied repeal obtaining in the construction of ordinary statutes yields to the inferences arising from the subject matter of legislation. Plenary powers having been found by experience valuable in the management of affairs already under the control of the board, the transfer of another department to the same control carries with it a strong implication that the added department is subject to the same plenary powers. The primary thought is not a mere transfer of authority, but the bringing of the added department within the control of the general supervising board. *It is a unity of administration, and not change of commission.*

" But our conclusions are not controlled by this construction alone. The court below placed its decision on what we conceive to be the true significance of the act of 1878. As said by that court, it is to be regarded as an organic act, intended to dispose of the whole question of a government

for this District.   It is, as it were, a constitution for the Dis-
trict.   It is declared by its title to be an act to provide 'a
permanent form of government for the District.'   The word
permanent is suggestive.   It implies that prior systems had
been temporary and provisional.   As permanent it is com-
plete in itself.   It is the system of government.   The
powers which are conferred are organic powers.   We look
to the act itself for their extent and limitations.   It is not
one act in a series of legislation, and to be made to fit into
the provisions of the prior legislation, but is a single com-
plete act, the outcome of previous experiments, and the final
judgment of Congress as to the system of government which
should obtain.   It is the constitution of the District, and its
grants of power are to be taken as new and independent
grants, and expressing in themselves both their extent and
limitations."

In view of these considerations, we conclude that it was
the intention of Congress, in the sixth section of the act of
June 11, 1878, to make the management and control of the
Metropolitan police of the District of Columbia an integral
part of the municipality, and intrusted as such to the Com-
missioners as the administrators of the affairs of the munici-
pality; and that such was the effect of the statute.   The
action of the Commissioners in the premises is, therefore,
the action of the municipality.

2.  But greater reliance seems to be placed by the appel-
lee upon the proposition that the District of Columbia is
exempt from liability in this case in consequence of the
nature of the duties exercised by the police force, which are
claimed to be governmental or public duties, and not duties
of a merely municipal character.

In the exercise of the powers conferred by the State upon
municipal organizations the distinction between purely
municipal functions and governmental duties is undoubtedly
well established, with the resulting consequence that, while
the municipality is held to liability in the courts of law in

respect of the former, no such liability can be enforced with respect to governmental duties. We deem it unnecessary to follow counsel into their elaborate discussion of this subject further than to observe that, in our opinion, much of the confusion and contrariety of judgment to be found in the authorities is due to the failure to observe the distinction between the right and the remedy. That which constitutes a trespass when done by an individual is not the less a trespass when done by the State itself, or by the agents of the State, or in the course of the administration of government; but the right of action thereon in the courts can not be exercised because the State can not be sued without its permission, and redress can be had only by appeal directly to the legislative authority; and in some cases, the individual right is compelled to yield entirely to the general good and the demands of a predominant public policy. But it is very clear to us that the maintainance of a nuisance, such as is here alleged and complained of, is not a governmental function. If it be granted that the duties of the police force are mainly and even exclusively public and governmental, it does not follow, upon any principle of sound reasoning, that the houses to which they resort when they are not in the performance of any such duty, or the appliances which are contained in such houses, should be permitted to become a nuisance detrimental to health. The performance of their public duties does not require the perpetration of a nuisance by them. On the contrary, the abatement of nuisances is part of their duty, and part of the duty of the municipality; and we would regard it as an absurdity to assume that their public duties could not be performed without the commission of a nuisance.

The mere maintainance or location of an ambulance stable, although possibly annoying and inconvenient to the residents of a neighborhood, may not of itself be held to be a nuisance, since it is a necessary and proper appliance of governmental authority; but the negligent, improper, and

unlawful manner of its maintainance, which is the thing of which complaint is here made, is not warranted by any requirement of governmental duty, and is, on the contrary, directly antagonistic to the demands of such duty.

3. That the District of Columbia is liable for the existence and maintainance of this nuisance, if nuisance there is, which of course remains to be established, seems to us to be very plain. Even if the contention of the appellee were well founded, that the control of the Metropolitan police force did not become a municipal function by virtue of the act of June 11, 1878, and that the duties of the police force were purely governmental, yet we would not hesitate to hold the District of Columbia liable as a municipality in this case. We would regard it as an absurdity to hold that the Commissioners, as administrators of the affairs of the District of Columbia, and as such authorized and required to abate nuisances within the territorial limits of the District, were without control over themselves as administrators of the police force to prevent or abate this nuisance. It is conceded, or at least it must be conceded, that, if a nuisance exists here, the Commissioners, as a board of police, permit, and therefore authorize, its maintainance. It would be a mere juggling with phrases to say that the Commissioners, as the executive officers of the municipality, for whose action or inaction the municipality is responsible, were powerless to abate the nuisance.

But not only the reason of the thing, but the express provisions of statutory law, require that the District of Columbia be held to liability in this case. Section 371 of the Revised Statutes of the United States for the District of Columbia, which is section 16 of the act of August 16, 1861 (12 Stat. 323), which is the act that first organized the Metropolitan police force, provides that "it shall be the duty of the proper authorities of the District to provide, at the expense of the cities of Washington and Georgetown respectively, all necessary accommodations within their respective

limits for the station houses required by the board of police
for the accommodation of the police force, for the lodging of
vagrants and disorderly persons, and for the temporary
detention of persons arrested for offenses, and to suitably
warm and light the same." And the appropriation act of
July 14, 1892 (27 Stat. 150); making appropriations for the
support of the government of the District of Columbia, con-
tained this item: "Buildings: For stables, for ambulances
and horses on ground now owned by the District of Colum-
bia, six thousand dollars"(p. 161). The District of Columbia,
therefore, is the owner of this stable; it owns the lot on which
the building stands; and it is the owner of the building
constructed thereon. That lot and building it is required
to make suitable for the accommodation of the police force,
or for the branch of the police force to be harbored there.
And plainly the duty does not cease with the construction
of the building; for the property does not pass beyond its
control. The duty is equal to keep it in proper condition
and to provide for its being suitable in the first instance. It
is not pretended that the District of Columbia has lost the
control of these premises. It has not rented or leased them.
It has retained and must retain them for the use and benefit
of the police force; and it must keep them in proper condi-
tion for that use. This necessarily implies that it must not
permit them to become a nuisance, injurious to the health
and comfort of the community.

Some argument has been based upon the theory that a
municipality can not be held liable at the suit of a private
person for the failure to perform a public duty, when it
receives no profit or special advantage to itself from the
performance of such public duty. But the matter of profit
or absence of profit has no place in the present case. A
municipality owning property stands in no different posi-
tion from a natural person in respect of the duty not to
permit it to become a nuisance. It would be strange indeed
if the question of the liability of a municipality for a

nuisance committed or permitted by it upon its own property to the detriment of the neighborhood were dependent upon the amount of gain derived by it from the existence of the nuisance. As we have said, the municipality is not in the performance of any public duty, but rather in the violation of its public duties, when it permits the maintainance of a nuisance upon its property.

From what we have said it follows, in our opinion, that there was error in the ruling of the court below in directing a verdict for the defendant, and in entering judgment thereon. The judgment of that court must, therefore, be *reversed; and the cause will be remanded, with directions to vacate such judgment, to set aside the verdict, and for further proceedings in the cause according to law. And it is so ordered.*